Kenneth E. Payson (admitted *pro hac vice*)
Davis Wright Tremaine LLP
920 Fifth Ave., Suite 3300
Seattle, WA 98104
Telephone: (206) 757-8126
*kennethpayson@dwt.com*

James H. Moon (admitted *pro hac vice*)
Davis Wright Tremaine LLP
865 S. Figueroa St., Suite 2400
Los Angeles, CA 90017
Telephone: (213) 633-6819
*jamesmoon@dwt.com*

Jeff Silvestri (Nevada Bar No. 5779)
McDonald Carano LLP
2300 W. Sahara Avenue, Suite 1200
Las Vegas, NV 89102
Telephone: (702) 873-4100
*jsilvestri@mcdonaldcarano.com*

*Attorneys for Defendant Blue Raven Solar, LLC*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| LOUIS NAIMAN,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>BLUE RAVEN SOLAR, LLC; RENOVATION REFERRAL, LLC; and GABRIEL ALAN SOLOMON,<br><br>　　　　　Defendants. | No. 2:19-cv-01643-JAD-EJY<br><br>**DEFENDANT BLUE RAVEN SOLAR, LLC'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON VICARIOUS LIABILITY; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>[*Declarations of Christopher Harman and Carlos Ezra Hernandez Filed Concurrently*]<br><br>Action Filed:　　September 18, 2019 |

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

1    **PLEASE TAKE NOTICE** that Defendant Blue Raven Solar, LLC ("Blue Raven")

2    hereby moves the Court for an order granting summary judgment in its favor on Plaintiff Louis

3    Naiman's sole cause of action for violation of the Telephone Consumer Protection Act because

4    he cannot establish a genuine dispute of material fact in support of Blue Raven's purported

5    "vicarious liability" for the actions of defendant Renovation Referral, LLC.  This motion is based

6    on this notice and motion; the attached Memorandum of Points and Authorities; the concurrently

7    filed Declarations of Christopher Harman and Ezra Hernandez; all pleadings, records, and files

8    in this action; and such evidence and argument as may be presented at or before the hearing on

9    this motion.

10

11   Dated:  September 18, 2020

12                                            /s/ Kenneth E. Payson
                                            Kenneth E. Payson (admitted *pro hac vice*)
13                                            Davis Wright Tremaine LLP
                                            920 Fifth Ave., Suite 3300
14                                            Seattle, WA 98104
                                            (206) 757-8126
15                                            *kennethpayson@dwt.com*

16                                            James H. Moon (admitted *pro hac vice*)
                                            Davis Wright Tremaine LLP
17                                            865 S. Figueroa St., Suite 2400
                                            Los Angeles, CA 90017
18                                            (213) 633-6819
                                            *jamesmoon@dwt.com*
19
                                            Jeff Silvestri (Nevada Bar No. 5779)
20                                            McDonald Carano LLP
                                            2300 W. Sahara Avenue, Suite 1200
21                                            Las Vegas, NV 89102
                                            (702) 873-4100
22                                            *jsilvestri@mcdonaldcarano.com*
23
                                            *Attorneys for Defendant Blue Raven Solar, LLC*
24

25

26

27

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

DAVIS WRIGHT TREMAINE LLP

920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3

Plaintiff Louis Naiman sued Defendant Blue Raven Solar, LLC ("Blue Raven") pursuant

4 the Telephone Consumer Protection Act ("TCPA") based on a single phone call that he received

5 on April 8, 2019.  The undisputed material facts, however, demonstrate that this call was not

6 made by Blue Raven but by Defendant Renovation Referral, LLC ("Renovation")—a separate

7 and independent lead-generation company owned by Defendant Gabriel Solomon.  Blue Raven

8 hereby moves for summary judgment because it cannot be held directly or vicariously liable

9 under the TCPA for Renovation's purportedly unauthorized phone call.

10

Blue Raven is fast-growing Utah-based company that offers solar panel services and

11 products to homeowners across the country.  (*See* Decl. of Christopher Harman ("Harman

12 Decl.") ¶ 2; Decl. of Carlos Ezra Hernandez ("Hernandez Decl.") ¶ 2.)  To reach its target

13 consumers, Blue Raven bolsters its internal marketing activities with lead referrals from third-

14 party vendors like Renovation.  (Harman Decl. ¶¶ 2-3.)  In February 2018, Blue Raven and

15 Renovation entered into a Master Service Agreement for Renovation to provide "live transfers"

16 of potential qualified customers of Blue Raven's solar power products.  (Hernandez Decl., Ex. A

17 (Master Service Agreement).)  In that agreement, Renovation expressly represented that it would

18 fully comply with all applicable laws in seeking prospects for Blue Raven.  (*Id.*, Ex. A at

19 BRS_000004.)  Because Blue Raven has no interest in soliciting customers without an interest in

20 its specialized products, the parties' contract required Renovation to refer to Blue Raven only

21 qualifying customers who have expressed interest in speaking to a residential solar expert about

22 residential solar products.  (*Id.* at BRS_000006.)  Once Renovation determined during a

23 preliminary telephone call that a prospect fell within the preset criteria, the prospect was notified

24 that he or she would be transferred over to a live representative of a participating solar

25 contractor.  (*Id.* at BRS_000004-05.)  Renovation transferred leads to numerous different

26 customers and Blue Raven had no control over which prospects Renovation transferred to it as

27 opposed to a different solar company.  (Harman Decl. ¶ 2.)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

This putative class action is based exclusively on Renovation's purported call to Mr. Naiman on April 8, 2019—over a year into its relationship with Blue Raven. Mr. Naiman received Renovation's call, professed interest in solar panel products, and was transferred to Blue Raven. (Harman Decl. ¶ 14-15, Exs. B-C (transcripts of call recordings).) Mr. Naiman did not and has not purchased any solar panel products from Blue Raven or entered into any other transaction with Blue Raven. (*Id.* ¶ 17.) Indeed, Mr. Naiman never had any contact with Blue Raven again after the call and instead filed this lawsuit on September 18, 2019. (*Id.* ¶ 15.)

Over the better part of the past year, the parties have conducted phased discovery into the threshold question of whether Blue Raven can be held vicariously liable for Renovation's purportedly unauthorized phone call. After full discovery into the issue, it is apparent that Mr. Naiman cannot meet his burden to prove Blue Raven is legally responsible for the sole call Renovation made to him under any of the three recognized theories of vicarious liability under the TCPA, i.e., based on (1) actual authority, (2) apparent authority, or (3) ratification.

*First*, Mr. Naiman cannot prove any "actual" agency relationship, which depends on Blue Raven having the right to control Renovation's actions. The undisputed material facts show Renovation expressly contracted to act as an independent contractor to generate potential customer leads for Blue Raven and expressly agreed to comply with all applicable laws and regulations, including the TCPA. (Hernandez Decl., Ex. A.) Blue Raven did not control the "manner and means" of Renovation's lead-generating work, as Renovation enjoyed broad discretion in how and when it performed its services. (Harman Decl. ¶¶ 5, 7-13.) This lack of control or direction from Blue Raven over the "manner and means" of Renovation's work precludes any finding of vicarious liability on a theory of actual agency.

*Second*, Mr. Naiman cannot prove any "apparent" agency relationship, which must be based on Mr. Naiman's reasonable belief that Renovation was acting on Blue Raven's behalf based on Blue Raven's representations or actions. The undisputed evidence shows Blue Raven neither did nor said anything to Mr. Naiman about Renovation's authority to act on Blue Raven's behalf. Indeed, during Blue Raven's only interaction with Mr. Naiman, it never mentioned

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

Renovation or told Mr. Naiman that Renovation was authorized to call on Blue Raven's behalf. (Harman Decl. ¶ 14, Ex. C (Blue Raven call recording).)  As a result, no agency relationship was formed between Blue Raven and Renovation under a theory of apparent authority.

*Third*, Mr. Naiman cannot prove any "ratification" theory of agency, which depends on Mr. Naiman establishing (a) a ratifiable action by Blue Raven's agent or putative agent, for which Blue Raven (b) had knowledge of all material facts, and (c) received or retained the benefits of the agent's action.  The undisputed material facts are that (a) Renovation did not act as Blue Raven's agent or putative agent (Harman Decl. ¶¶ 5, 7-13), (b) Blue Raven did not have knowledge or reason to believe that Renovation violated the TCPA at the time of Renovation's call to Mr. Naiman (Hernandez Decl. ¶¶ 10-12), and (c) Blue Raven never received any benefit from Renovation's purported illicit call to Mr. Naiman (Harman Decl. ¶ 17).

Because it is not liable for Renovation's actions, judgment should be entered in Blue Raven's favor on Mr. Naiman's sole claim under the TCPA.

## II.      STATEMENT OF UNDISPUTED FACTS

### A.      Blue Raven Contracts with Renovation.

1.      Blue Raven is a Utah-based company that offers solar panel products and services to homeowners across the country.  (Harman Decl. ¶ 2 Hernandez Decl. ¶ 2.)

2.      In addition to its own marketing activities, Blue Raven utilizes lead-referral vendors like Renovation to identify potential customers.  (Harman Decl. ¶ 2;-3 Hernandez Decl. ¶ 2.)

3.      Blue Raven operates a call center that receives inbound calls from prospective leads transferred by lead generation vendors.  (Harman Decl. ¶ 5.)

4.      Renovation entered into a Master Service Agreement with Blue Raven as of February 10, 2018, to provide "live transfers" of potential qualified customers of Blue Raven's solar power products.  (Hernandez Decl., Ex. A; Harman Decl. ¶ 3, Ex. A.)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

5.  That contract required Renovation to provide "warm transfers" of qualifying customers who have "expressed interest in speaking to a residential solar expert" about solar products.  (Hernandez Decl., Ex. A at BRS_000006; Harman Decl. ¶ 4.)

6.  In particular, once Renovation determined during a preliminary telephone call that a prospect fell within the minimum preset criteria (e.g., homeowner status, credit score, sun exposure), the prospect was to be notified that he or she would be transferred over to a live representative of a participating solar contractor.  (Hernandez Decl., Ex. A at BRS_000004-05.)

7.  During the preliminary call, Renovation was to identify itself to potential leads as "Renew."  (Hernandez Decl., Ex. A at BRS_000005.)

8.  After the lead was transferred to Blue Raven, the Blue Raven representative would introduce the lead to "Blue Raven" and obtain verbal permission from the prospect to speak with Blue Raven about its solar services.  (Hernandez Decl., Ex. A at BRS_000005.)

9.  Once a Renovation representative transferred a lead to a Blue Raven representative, the Renovation representative dropped off the call and its involvement with the lead ended.  (*See* Harman Decl. ¶ 6, Exs. B-C.)

10.  Blue Raven was neither involved in the pre-transfer portion of the call with Renovation nor did it have knowledge of any call placed by Renovation prior to the call being transferred to a Blue Raven sales representative.  (Harman Decl. ¶ 7.)

11.  Under the Master Service Agreement, Renovation contracted to provide its services to Blue Raven as an independent contractor and represented that it would fully comply with all applicable laws in seeking prospects for Blue Raven.  (*See* Hernandez Decl., Ex. A at BRS_000004 ("Independent Contractor:  S&A is offering and selling its services per this arm's length Agreement as an independent contractor"); *id.* ("At no time does the company cold call individuals, nor use any automated or Press 1 systems, all data called is Opt IN Internet, and anything over 60 days old is scrubbed against the DNC registry.  [Renovation] is responsible for all compliance related to seeking out prospects and does not hold said company responsible for

any violation.  Compliance is above all a major priority and we hold a ZERO tolerance for any agency that misrepresents [Renovation] and its clients.")).)

12.     It was the express intent of Blue Raven that Renovation not be an agent of Blue Raven, but rather an independent contractor.  (Hernandez Decl., Ex. A; Harman Decl. ¶ 3.)

13.     Blue Raven expected that any lead-generation activities conducted by Renovation would comply with all applicable laws.  (Hernandez Decl., Ex. A; Harman Decl. ¶ 19.)

14.     Renovation was paid per qualifying transfer, not per hour or by salary, and was free to provide the same or similar services to others, which it did.  (Hernandez Decl., Ex. A at BRS_000006; Harman Decl. ¶¶ 2, 12.)  It also had the ability to negotiate the rate Blue Raven paid per qualified lead.  (*Id*.)

15.     Renovation had sole control over the method, detail, and means of performing the lead-generation services for Blue Raven.  (Harman Decl. ¶¶ 5, 7-11; Hernandez Decl. ¶¶ 7-10.)

16.     Blue Raven did not supply Renovation with phone numbers for potential leads nor did it provide Renovation with a script for the calls Renovation placed to prospective leads. (Harman Decl. ¶¶ 10-11; Hernandez Decl. ¶ 7.)

17.     Blue Raven had no knowledge or control over how Renovation identified potential leads and which subcontractors Renovation used to identify potential leads.  (Harman Decl. ¶ 10; Hernandez Decl. ¶ 7.)

18.     Blue Raven also had no knowledge or control over when Renovation placed called to prospective leads, which prospective leads Renovation called, or how many calls Renovation placed to prospective leads.  (Harman Decl. ¶ 10; Hernandez Decl. ¶ 8.)

19.     Prior to the filing of this lawsuit, Blue Raven was unaware of the number of calls Renovation actually placed to potential leads.  (Hernandez Decl. ¶ 8.)

20.     Blue Raven also had no knowledge or control over how many employees Renovation employed or how many hours Renovation employees worked, nor did it provide Renovation with offices, telephones, or any other facilities and equipment Renovation used to place calls to potential leads.  (Harman Decl. ¶ 11; Hernandez Decl. ¶ 7.)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

21.     Renovation did not have direct access to Blue Raven's computer systems or customer information, and could not directly enter lead information into Blue Raven's computer systems.  (Harman Decl. ¶ 8; Hernandez Decl. ¶ 9.)

22.     Renovation did not possess specific details regarding the nature and pricing of Blue Raven's products and services.  (Harman Decl. ¶ 8; Hernandez Decl. ¶ 9.)

23.     Renovation did not possess the ability or authorization to sell Blue Raven's products and services to potential leads.  (Harman Decl. ¶ 9; Hernandez Decl. ¶ 9.)

24.     Blue Raven never authorized Renovation to use its name in any lead-generation efforts.  (Harman Decl. ¶ 11.)

**B.     Renovation Calls Mr. Naiman.**

25.     Mr. Naiman was called by a representative for Renovation (calling as one of its d/b/a's, "Renew") on April 8, 2019 at 11:01 a.m.  (First Am. Compl. ("FAC"), ECF No. 42 ¶ 30.)

26.     During Renovation's preliminary call with Mr. Naiman, the Renovation representative speaking with Mr. Naiman identified himself as calling from "Renew Solar Power."  (Harman Decl., Ex. B (Renovation call recording); FAC, ECF No. 42 ¶ 40.)

27.     Mr. Naiman expressed interest in home solar products.  (Harman Decl., Ex. B.)

28.     Renovation's representative asked Mr. Naiman a few limited questions about Mr. Naiman's home and finances to determine if Mr. Naiman met Blue Raven criteria for qualified leads.  (Harman Decl., Ex. B.)

29.     Renovation's representative mentioned Blue Raven by name only right before Renovation transferred Mr. Naiman's call to Blue Raven's inbound calling center.  (Harman Decl., Ex. B.)

30.     Renovation referred to Blue Raven as one of Renovation's solar partners. (Harman Decl., Ex. B.)  The Renovation representative then transferred the call to a Blue Raven's sales representative.  (*Id.* ¶ 15, Ex. C (Blue Raven call recording).)

31.     On its call with Mr. Naiman, Blue Raven's sales representative never mentioned Renovation.  (Harman Decl., Ex. C.)

32.     Blue Raven's sales representative never told Mr. Naiman that Renovation was authorized to call Mr. Naiman on Blue Raven's behalf.  (Harman Decl., Ex. C.)

33.     Based on Mr. Naiman's purported interest, Blue Raven set an appointment with Mr. Naiman for a free estimate to outfit his home with solar products.  (Harman Decl., Ex. C.)

34.     On April 16, 2019, a week after the call, Mr. Naiman cancelled the appointment because he purportedly changed his mind about wanting solar products.  (Harman Decl. ¶ 15.)

35.     Shortly thereafter, on May 7, 2019, Mr. Naiman's attorney sent a letter to Blue Raven regarding a purported TCPA violation based on the April 2019 call.  (Harman Decl., Ex. D.)

36.     Blue Raven did not sell any products or services to Mr. Naiman, realize any revenue or profit, or obtain any benefit from the April 8, 2019 call Renovation placed to Mr. Naiman.  (Harman Decl. ¶ 17.)

37.     To Blue Raven's knowledge, Blue Raven's only direct interaction with Mr. Naiman was the April 8, 2019 transfer from Renovation.  (Harman Decl. ¶ 14.)

38.     No one at Blue Raven ever told Mr. Naiman that Renovation was Blue Raven's agent or that Renovation was authorized to call Mr. Naiman on Blue Raven's behalf.  (Harman Decl. ¶ 14, Ex. D.)

**C.     Blue Raven Lacked Actual or Constructive Knowledge that Renovation Engaged in Conduct in Violation of the TCPA.**

39.     Blue Raven never authorized Renovation to engage in conduct that would violate the TCPA or any other applicable law.  (Harman Decl. ¶ 19.)

40.     At the time Renovation placed the call to Mr. Naiman, Blue Raven did not have reason to believe Renovation was violating the TCPA or any other applicable law.  (Harman Decl. ¶ 20; Hernandez Decl. ¶ 11.)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

41.     Prior to the allegedly unauthorized call to Mr. Naiman in April 2019, Blue Raven received TCPA complaints from only one individual, Mark Fitzhenry.  (Harman Decl. ¶ 20; Hernandez Decl. ¶ 11.)

42.     Blue Raven investigated Mr. Fitzhenry's allegations and received consistent representations from Gabriel Solomon, Renovation's Chief Executive Officer, that Mr. Fitzhenry's allegations were baseless and that Renovation had received the proper consent from Mr. Fitzhenry.  (Hernandez Decl. ¶ 12.)

43.     Throughout its relationship with Blue Raven, Renovation repeatedly affirmed Blue Raven that it acted in compliance with the Master Service Agreement and was not violating the TCPA or any other applicable law.  (Harman Decl. ¶¶ 20-21; Hernandez Decl. ¶ 12.)

44.     On July 8, 2020, Blue Raven terminated its Master Service Agreement with Renovation. (Harman Decl. ¶ 21.)

**D.     Mr. Naiman Sues Blue Raven.**

45.     Mr. Naiman initiated this action against Blue Raven on September 18, 2019.  (*See* ECF No. 1.)

46.     The crux of Mr. Naiman's operative First Amended Complaint against Defendants Blue Raven, Renovation, and Gabriel Solomon is that he received an automated telemarketing call without his prior express written consent on April 8, 2019 in violation of the TCPA.  (FAC ¶ 30.)

47.     Mr. Naiman alleges that Mr. Solomon owns and operates Renovation and that Renovation—not Blue Raven—made the purportedly unauthorized telemarketing calls to his phone number in April 2019.  (FAC ¶¶ 3, 8, 30, 40.)

48.     Mr. Naiman seeks to hold Blue Raven vicariously liable for the third party's actions based on an "agency" theory.  (FAC ¶¶ 47-63.)[1]

---

[1] Counsel for Mr. Naiman also filed a new class action complaint against Blue Raven, Renovation, and Mr. Solomon in the United States District Court for the Southern District of Ohio on June 5, 2020.  (*See Johansen v. Blue Raven Solar, LLC et al.*, No. 2:20-cv-02930.) That complaint similarly alleges that Blue Raven is vicariously liable for Renovation's purported

**E.      The Parties Complete Phased Discovery.**

49.      On January 10, 2020, Blue Raven filed a Motion for Protective Order seeking to limit discovery in the first instance to issues relating to Blue Raven's purported vicarious liability for Renovation's calling activity.  (ECF No. 27.)

50.      The Court entered an order granting Blue Raven's request for phased discovery on January 14, 2020.  (ECF No. 29.)

51.      On January 31, 2020, the Court entered a schedule for taking discovery into vicarious liability issues and Blue Raven's anticipated Motion for Summary Judgment on the vicarious liability issue.  (ECF No. 31.)

52.      On May 29, 2020, the Court continued the deadline for discovery into vicarious liability issues until August 28, 2020, and the deadline for Blue Raven's motion until September 18, 2020.  (ECF No. 39.)

53.      Now, after completion of all pending discovery in connection with vicarious liability, Blue Raven submits its Motion for Summary Judgment for determination by the Court.

## III.      LEGAL STANDARD

Summary judgment is appropriate where the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of establishing it is entitled to judgment as a matter of law based on an "absence of a genuine issue of material fact" as to an "element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 322 fn 3.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Kristensen v. Credit Payment Servs. Inc.*,

TCPA violations based on its alleged calls to a putative class of individuals whose residential numbers were listed on the National Do-Not-Call Directory.  Blue Raven has objected to the Ohio venue and may file a motion to transfer that parallel action to this Court.

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

2015 WL 4477425, at *2 (D. Nev. July 20, 2015).  Instead, the nonmoving party "must produce specific evidence, through affidavits or admissible discovery material, to show" a sufficient evidentiary basis on which a reasonable fact finder could find in his favor.  *Id.*

## IV.    ARGUMENT

"The three elements of a TCPA claim are:  (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent."  *Meyer v. Portfolio Recovery Assocs.*, LLC, 707 F.3d 1036, 1043 (9th Cir. 2012) (citing 47 U.S.C. § 227(b)(1)).  The Court should grant summary judgment in Blue Raven's favor because Mr. Naiman cannot present admissible evidence sufficient to raise a material dispute of fact under either of the "two potential theories of liability" under the TCPA:  (1) "direct liability" or (2) "vicarious liability."  *See Thomas v. Taco Bell Corp.*, 582 F. App'x 678, 679 (9th Cir. 2014).  As explained below, the undisputed material facts demonstrate that Blue Raven (1) did not make the call at issue, and (2) cannot be held vicariously for the actions of Renovation under any recognized theory of agency.

### A.    Blue Raven Is Not Directly Liable Because It Did Not Call Mr. Naiman.

Only the maker of an unlawful call or sender of an unlawful text message can be held directly liable under the TCPA.  *See Thomas v. Taco Bell Corp.,* 879 F. Supp. 2d 1079, 1084 (C.D. Cal. 2012), *aff'd*, 582 F. App'x 678 (9th Cir. 2014).  Here, it is undisputed that Renovation, not Blue Raven, placed the single purportedly unauthorized phone call to Mr. Naiman.  (*See* Statement of Undisputed Facts ("SUF"), *supra*, No. 25.)  Blue Raven thus cannot be held directly liable for any purported violation of the TCPA based on Renovation's call.  *See Kristensen v. Credit Payment Servs. Inc.*, 2015 WL 4477425, at *2 (D. Nev. July 20, 2015) (no direct liability where defendants did not place TCPA-violating calls); *Abante Rooter & Plumbing, Inc. v. Arashi Mahalo, LLC*, 2019 WL 6907077, at *1 (N.D. Cal. Dec. 19, 2019) ("Arashi did not call Abante; therefore, Arashi did not directly violate the TCPA.").

**B.      Blue Raven Is Not Vicariously Liable for Renovation's Call to Mr. Naiman.**

To establish vicarious liability under the TCPA, a plaintiff must prove an agency relationship under one of the three "bedrock theories of agency"—(1) actual authority, (2) apparent authority, or (3) ratification. *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 449 (9th Cir. 2018); *accord Cooley v. Freedom Forever, LLC*, 2019 WL 8126847, at *2 (D. Nev. Nov. 25, 2019).  The party relying on an agency theory of liability bears the burden of establishing the existence of an agency relationship.  *See* Restatement (Third) of Agency (the "Restatement") § 4.06 cmt. b.  Summary judgment therefore is required where the plaintiff fails to adduce evidence sufficient to meet its burden of showing an agency relationship. *See Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1013-15 (9th Cir. 2018) (affirming summary judgment in the absence of disputed factual issues regarding agency theory).  The undisputed material facts in this case confirm Mr. Naiman cannot establish Blue Raven is vicariously liable for Renovation's actions under any of these theories.

**1.      Renovation Lacked Actual Authority.**

**a.      The Master Services Agreement Forecloses Actual Agency.**

Blue Raven's contract with Renovation precludes any theory of actual authority for Renovation's call to Mr. Naiman.  "Actual authority is limited to actions 'specifically mentioned to be done in a written or oral communication' or 'consistent with' a principal's 'general statement of what the agent is supposed to do.'"  *Jones*, 887 F.3d at 449 (quoting *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 940 (9th Cir. 2017)).

Settled law precludes liability for a TCPA violation under an actual authority theory where the contract between the purported principal and its alleged agent expressly prohibits conduct that violates the TCPA.  *See Jones*, 887 F.3d at 449-50 ("[Defendant] expressly prohibited [alleged agent] from employing these marketing tools . . . [a]ccordingly, we reject the actual authority theory."); *Makaron v. GE Sec. Mfg., Inc.*, 2015 WL 3526253, at *7 (C.D. Cal. May 18, 2015) (no actual authority where contract expressly foreclosed allegedly unlawful activity in question).

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

1    Here, the Master Service Agreement expressly required Renovation to comply with

2   applicable laws and regulations, including the TCPA.  (*See* Hernandez Decl., Ex. A at

3   BRS_000004; Harman Decl., Ex. A.)  In particular, the Master Service Agreement prohibited

4   Renovation from "cold calling" individuals, using "any automated or Press 1 systems," and using

5   anything but "opt-in" data.  (*Id*.)  All lead information over 60 days old had to be scrubbed

6   against the DNC registry.  (*Id*.)  Mr. Naiman has also not adduced any evidence that Blue Raven

7   authorized Renovation to contact individuals who had not consented to receive calls or that it

8   authorized Renovation to use an auto-dialer.  (SUF No. 39.)  This lack of evidence, coupled with

9   the Master Service Agreement's express prohibition on non-compliant conduct and Renovation's

10   multiple representations that it was dialing opt-in numbers through a TCPA-compliant system,

11   leaves Plaintiff without a viable theory liability under actual authority.  *See Abante Rooter*, 2019

12   WL 6907077, at *1 (no actual authority where lead generator "repeatedly represented that its

13   services were compliant with the TCPA"); *Makaron*, 2015 WL 3526253, at *7.

14   **b.    Blue Raven Did Not Control Renovation's Actions.**

15   Blue Raven is also entitled to summary judgment on a theory of actual authority because

16   it did not control the manner and means of Renovation's lead-generation work.

17   "An agent acts with actual authority when, at the time of taking action that has legal

18   consequences for the principal, the agent reasonably believes, in accordance with the principal's

19   manifestations to the agent, that the principal wishes the agent so to act."  *Makaron*, 2015 WL

20   3526253, at *6 (citing *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 622 F. Supp. 2d 890,

21   899 (N.D. Cal. 2009)).  "Generally, an individual acting as an 'independent contractor,' rather

22   than an agent, does not have the traditional agency relationship with the principal necessary for

23   vicarious liability."  *Naiman v. TransVia LLC*, 2017 WL 5992123, at *12 (N.D. Cal. Dec. 4,

24   2017).  Even if an entity attempts to act for another's benefit, no traditional agency relationship

25   forms unless the would-be agent is "subject to the principal's control."  *United States v. Bonds*,

26   608 F.3d 495, 506 (9th Cir. 2010); *see also Jones*, 887 F.3d at 450 ("In determining whether

27

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

1   vicarious liability may be imposed, the extent of control exercised by the principal is the

2   essential ingredient.”).

3       In the TCPA context, “control” means the purported principal has the right to control “the

4   manner and means of” the would-be agent’s allegedly violating conduct. *Thomas*, 879 F. Supp.

5   2d at 1084. “Mere approval . . . cannot be equated with control over the manner and means by

6   which the campaign was designed and executed.” *Id.* at 1085. The Ninth Circuit has adopted a

7   ten-part test from the employment context to determine “whether a [purported principal] has

8   enough authority to control the actions of its [alleged agent] such that the principal may be held

9   vicariously liable.” *Jones*, 887 F.3d at 450. Those factors are:

10       1) the control exerted by the [purported principal], 2) whether the [alleged agent] is
11   engaged in a distinct occupation, 3) whether the work is normally done under the
     supervision of [the purported principal], 4) the skill required, 5) whether the
12   [purported principal] supplies tools and instrumentalities [and the place of work],
     6) the length of time employed, 7) whether payment is by time or by the job,
13   8) whether the work is in the regular business of the [purported principal], 9) the
     subjective intent of the parties, and 10) whether the [purported principal] is or is
14   not in business. (*Id.*)

15       Applying these factors, Mr. Naiman cannot adduce sufficient evidence demonstrating

16   Blue Raven exerted the required control over Renovation’s work needed to establish actual

17   authority. As to the first *Jones* “control” factor, the undisputed material facts demonstrates

18   Renovation had broad discretion in how it conducted its lead-generation efforts. Blue Raven did

19   not instruct Renovation on how it should conduct its lead-generation campaign, i.e., how it

20   should contact potential leads. (SUF Nos. 15-18.) Further, Blue Raven did not provide

21   Renovation with a list of call recipients or the script Renovation’s telemarketers used for its lead-

22   generation work. (SUF No. 16.) It did not set quotas for the number of calls Renovation had to

23   place, nor did it monitor the calls Renovation’s representatives placed to potential leads. (SUF

24   No. 18.) Blue Raven, moreover, did not have the right to control the hours Renovation’s

25   telemarketers worked. (SUF No. 20.)

26       This lack of control or direction from Blue Raven over the “manner and means” of

27   Renovation’s work precludes any finding of vicarious liability on a theory of actual authority.

*See Jones*, 887 F.3d at 451 (holding no actual authority existed even though marketing firm "was only permitted to use the 'scripts and materials' [defendant] approved and had to comply with the 'guidelines and procedures' [defendant] provided when selling [defendant's] products. . . ."); *Knapp v. Sage Payment Sols., Inc.*, 2018 WL 659016, at *3 (N.D. Cal. Feb. 1, 2018) (no agency relationship where defendant did not control or supervise the purported agent "in the course in the course of [its] day-to-day activities"); *Mey v. Pinnacle Security, LLC,* 2012 WL 4009718 at *5 (N.D. W. Va. Sept. 12, 2012) (granting summary judgment in favor of defendant where defendant did not have access to the records and/or control over calls made by its lead generators, and lead generators used by defendant also outsourced lead generation to third parties with whom defendant had no relationship).

The remaining *Jones* factors strongly weigh against an inference of actual authority:

- Renovation is engaged in a "distinct occupation" from Blue Raven, namely the provision of lead-generation services, while Blue Raven's business is in offering solar panel products and services (SUF No. 1);

- Renovation determined the method, detail, and means of performing lead-generation services for Blue Raven (SUF Nos. 15-21);

- Renovation maintained a separate business location, used its own equipment, and had the ability to set its own rates and hours of operation (SUF No. 20);

- Renovation used its own subcontractors for lead data and calling technology (SUF No. 17);

- Blue Raven and Renovation's business relationship lasted for only a little over two years (SUF Nos. 4, 44);

- Renovation was paid by qualified leads, not per hour or by salary, and was free to provide the same or similar services to others (SUF No. 14);

- The Master Service Agreement expressly disclaims any agency relationship for lead-generation services provided by Renovation, making clear that Blue Raven

DAVIS WRIGHT TREMAINE LLP

920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

intended to hire Renovation as an independent contractor for its lead-generation services, not as its agent or own employee (SUF No. 12); and

- Blue Raven is still in the business of offering solar panel products to homeowners across the country (SUF No. 1).

Taken together, the *Jones* factors preclude vicarious liability on an actual authority theory. *See, e.g.*, *Jones*, 887 F.3d at 451 (finding defendant had "only limited control" over telemarketer where defendant required telemarketer to keep records, give defendant weekly reports, collect payments on behalf of defendant, and obtain defendant's approval before using sales materials, but defendant did not "have the right to control the hours the [alleged agent] worked," or to "set quotas for the number of calls or sales the [alleged agent] had to make"); *Armstrong v. Investor's Business Daily, Inc.*, 2020 WL 2041935, at *8-9 (C.D. Cal. March 6, 2020) (holding no actual authority because majority of Jones factor weighed in defendant's favor despite court finding the defendant "exercised some control over the content of the text messages that [alleged agent] sent on its behalf."); *Knapp*, 2018 WL 659016, at *3 (finding that the defendant exercised "limited control" under *Jones* factors where it similarly did not set quotas for the number or amount of sales for the telemarketers, control the hours they worked, or supervised the telemarketers in the course of its day-to-day activities).

Based on the Master Service Agreement and the undisputed facts regarding Blue Raven's relationship with Renovation, Mr. Naiman cannot identify a triable issue of fact with respect to actual agency.

### 2. Renovation Lacked Apparent Authority.

"Apparent authority arises when a third party reasonably believes that an agent had authority to act on behalf of the principal and that belief can be traced to the principal's own manifestations." *Kristensen*, 2015 WL 4477425, at *4.

This theory of agency "can only 'be established by proof of something said or done by the [alleged principal], on which [the plaintiff] reasonably relied.'" *Thomas v. Taco Bell Corp.*, 582 F. App'x at 679 (citing *NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity*, 124 F.3d

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

1094, 1099 (9th Cir.1997)).  That the caller "simply 'claimed authority or purported to exercise it'" is insufficient.  *Id.*; *see also Abante Rooter & Plumbing v. Farmers Grp., Inc.*, 2018 WL 288055, at *6 (N.D. Cal. 2018) (no apparent authority as a matter of law despite allegations that purported agents called on defendant's behalf, mentioned defendant's name, and promoted defendant's brand).  Nor is it enough "that one party performs a service that facilitates the other's business." *Kristensen*, 2015 WL 4477425, at *4; *Pannaci v. A1 Solar Power, Inc*., 2015 WL 3750112, at *7 (N.D. Cal. June 15, 2015) (holding apparent authority claim failed as a matter of law even though caller "specifically stated that the intention was to refer Plaintiff to [Defendant]"); *Makaron*, 2015 WL 3526253, at *9 (granting defendant's summary judgment on apparent authority claim: "Just because an entity sells a particular brand of products does not mean that that entity has *apparent authority* to speak or act for that brand") (emphasis in original).  Instead, the would-be principal "must make some outward manifestation from which reasonable third parties could trace their belief that the agent has authority to act on the principal's behalf." *Kristensen*, 2015 WL 4477425, at *54.

FCC guidance illustrates the kind of evidence that may support apparent authority in the TCPA context.  *See In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6592 (2013).  Examples include "evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control," such as "detailed information regarding the nature and pricing of the seller's products and services or [ ] the seller's customer information," or evidence that the seller permits the caller "to enter consumer information into the seller's sale or customer systems" or "use the seller's trade name, trademark and service mark."  *Id*.  Courts reject theories of apparent authority where a plaintiff lacks such evidence.  *See, e.g.*, *Rogers v. Postmates Inc.*, 2020 WL 1032153, at *4 (N.D. Cal. Mar. 3, 2020) (dismissing complaint lacking allegations that text sender had access to exclusive information or system or permission to use seller's name); *Makaron*, 2015 WL 3526253, at *8 (no apparent authority where call "did not include a statement that [the caller] was an 'Authorized [ ] Dealer,' a representative or agent of [the seller],

or any other language that would lead the listener to reasonably believe that the caller was acting on [the seller's] behalf"); *Kristensen*, 2015 WL 4477425, at *5 (buying leads did not constitute "some manifestation that was visible to the third parties"); *Abante Rooter*, 2019 WL 6907077, at *1 (no apparent authority based on calls transferred to inbound call center).

Here, there is no evidence that Blue Raven did or said anything that could give Mr. Naiman the impression that Renovation had authority to act on Blue Raven's behalf.  During Renovation's call with Mr. Naiman, Renovation's representative repeatedly identified himself as calling on behalf of Renovation—not Blue Raven.  (SUF No. 26.)  Renovation's representative asked Mr. Naiman a few limited questions about Mr. Naiman's home and finances to determine if Mr. Naiman met Blue Raven criteria for qualified leads.  (SUF No. 28.)  Blue Raven was only mentioned by name right before Renovation transferred Mr. Naiman's call (with Mr. Naiman's consent) to Blue Raven's inbound calling center.  (SUF No. 29.)  At that point, Renovation's representative merely identified Blue Raven as one of Renovation's "solar partners."  (SUF No. 30.)  Blue Raven never indicated to Mr. Naiman that Renovation was its agent.  (SUF No. 31.)  Indeed, after Renovation transferred Mr. Naiman's call to Blue Raven's inbound call center, Blue Raven's representative never even mentioned Renovation, let alone told Mr. Naiman that Renovation was authorized to call on Blue Raven's behalf.  (SUF No. 31.) Renovation also did not use—much less have access to—any detailed information about Blue Raven's products or its prices.  (SUF No. 22.)  It is also did not have access to Blue Raven's customer information system.  (SUF No. 21.)

These undisputed facts foreclose any argument that Blue Raven manifested to Mr. Naiman that Renovation had the authority to act on Blue Raven's behalf.  *See, e.g.*, *Cunningham v. Health Plan Intermediaries Holdings, LLC*, 2018 WL 835222, at *6 (N.D. Ill. Feb. 13, 2018) (rejecting apparent authority claim despite allegation purported agent "mentioned Defendants' products on their calls and sent him paperwork featuring Defendants' names"); *Linlor v. Five9, Inc.*, 2017 WL 5885671, at *3 (S.D. Cal. Nov. 29, 2017) (apparent authority claim rejected against Five9 even though Five9 "was identified as the teleco operator/agent

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

1   responsible for [the toll-free numbers] identified in SMS messages sent to the Plaintiff's cell

2   phones"); *Kristensen*, 2015 WL 4477425, at *5-6 (allegation that alleged principal hired Click

3   Media to generate leads and paid it to direct leads to Click Media's websites insufficient to show

4   apparent authority); *Panacci v. A1 Solar Power, Inc.*, 2015 WL 3750112, at *7 (N.D. Cal.

5   June 15, 2015) (dismissing apparent authority claim even though caller specifically "stated that

6   the intention was to refer Plaintiff to Defendant A1 Solar"); *Makaron*, 2015 WL 3526253, at *9

7   (rejecting apparent authority argument despite purported agents having authority to use

8   principal's trade name).

9           **3.**        **Blue Raven Did Not Ratify Renovation's Conduct.**

10   Last, Blue Raven cannot be held vicariously liable for Renovation's call under a

11   ratification theory.  "Ratification is the affirmance of a prior act done by another, whereby the act

12   is given effect as if done by an agent acting with actual authority." *Henderson v. United Student*

13   *Aid Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. 2019) (quoting Restatement § 4.01 cmt. b).

14   Ratification may occur by a party "receiving or retaining benefits [an act] generates if the person

15   has knowledge of material facts."  Restatement § 4.01 cmt. g.  Mr. Naiman cannot demonstrate a

16   jury question on any of the three elements that ratification requires:  (1) a ratifiable action, (2) for

17   which the principal had knowledge (or notice, which it willfully ignored) of all material facts,

18   and (3) received or retained the benefits.

19           **a.**        **Plaintiff Cannot Show a Purported Agency Relationship.**

20   As an initial matter, Mr. Naiman cannot establish ratification as a matter of law because

21   he cannot show that Renovation acted or purported to act on Blue Raven's behalf when it called

22   Mr. Naiman.  (SUF No. 26.)

23   The Ninth Circuit has held that "'when an actor is not an agent and does not purport to be

24   one,' the doctrine of ratification does not apply."  *Kristensen*, 879 F.3d at 1014 (quoting

25   Restatement § 4.03 cmt. b.); *see also Thomas*, 582 F. App'x at 680 ("Although a principal is

26   liable when it ratifies an originally unauthorized tort, the principal-agent relationship is still a

27

DAVIS WRIGHT TREMAINE LLP

920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

1   requisite, and ratification can have no meaning without it."); *Pascal v. Agentra, LLC*, 2019 WL

2   5212961, at *4 (N.D. Cal. Oct. 16, 2019) (accord).

3         For instance, in *Kristensen*, the Ninth Circuit affirmed the district court's order granting

4   summary judgment to a defendant because the plaintiff could not raise a genuine issue of

5   material fact as to defendant's ratification of allegedly unauthorized text messages sent by its

6   lead-generation vendor.  879 F.3d at 1015.  The district court expressly rejected the plaintiff's

7   "theory that the defendants ratified [the vendor's] texting campaign by accepting leads while

8   knowing that AC Referral was using texts to generate those leads."  *Id.* at 1013.  The Ninth

9   Circuit affirmed the ruling because the publisher "was neither an agent nor a purported agent of

10  the lenders [its] actions do not qualify as ratifiable acts."  *Id.* at 1014-15.

11        By contrast, in *Henderson v. United Student Aid Funds, Inc.*, the Ninth Circuit concluded

12  that a debt collectors' activities raised an issue of fact on a ratification theory where the

13  collectors "pretended and demonstrably assumed to act" as the debtholder's agent by acting

14  autonomously to collect student loan payments on the principal's behalf.  918 F.3d at 1074.

15  The collectors had authority to "handle many aspects of collecting and repayment, including

16  making calls to borrowers, setting up payment plans, granting temporary delays, and accepting

17  loan payments."  *Id.* at 1070.  "Without needing [the lender's] approval, the collectors

18  negotiated, deferred, and took payments on [its] behalf."  *Id.* at 1074.  Through these activities,

19  the collectors acted like agents, even if they did not have actual authorization to do so and

20  therefore, the principal could ratify the collectors' illicit actions.  *Id.*

21        Renovation's calling activity falls on the *Kristensen* side of this divide.  As explained

22  above, Renovation called Mr. Naiman using its own name and Mr. Naiman agreed to be

23  transferred to a separate local company offering solar services.  (SUF Nos. 26, 27.)  Given the

24  limited contractual relationship, Renovation also could not and did not conduct or negotiate any

25  sales of solar products with customers.  (SUF No. 23.)  Instead, Renovation's involvement with

26  the lead ended when it transferred the lead to Blue Raven.  (SUF No. 9.)  If Mr. Naiman had

27  wanted to purchase a service from Blue Raven, Blue Raven would have been the one to conduct

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

1  that transaction.  (SUF No. 23.)  Blue Raven alone had information about the products and

2  services available, as well as their prices.  (SUF Nos. 22, 23.)  Blue Raven alone had access to

3  sign up new customers for Blue Raven's products and services.  (*Id.*)  These facts all distinguish

4  this case from *Henderson*, where the debt collectors had the information and tools necessary to

5  act as an authorized agent, including by collecting payments on the lender's behalf.

6        The present facts are practically identical to the circumstances in *Cooley v. Freedom*

7  *Forever,* 2019 WL 8126847 (D. Nev. Nov. 25, 2019), which analyzed a ratification-based TCPA

8  claim based on the violating caller's lead-generation activity for a defendant.  Applying the

9  *Kristensen/Henderson* framework, the Honorable James C. Mahan ruled that the mere

10  transmission of a lead from a lead-generation service to a defendant was insufficient to establish

11  a theory of ratification as a matter of law.  *Id.* at *4.  In particular, the Court held that the

12  plaintiff's ratification claim failed because the violating caller did not claim "to be calling as

13  [the defendant] or under its authority," and did not "negotiate[ ] any prices or t[ake] payments on

14  [defendant]'s behalf."  *Id.*  The lack of purported agency and independent action distinguished

15  the caller's lead-generation activity, regardless of whether the entity receiving the lead accepted

16  it.  The facts in this case are virtually the same as the facts here, which are fatal to any

17  ratification theory.

18            **b.**    **Blue Raven Lacked Knowledge of Red Flags.**

19        Blue Raven also did not ratify Renovation's activities for the independent reason that it

20  had neither knowledge nor inquiry notice that it ignored of Renovation's purportedly illicit call

21  to Mr. Naiman in violation of the TCPA.

22        The principal "is not bound by a ratification made without knowledge of material facts

23  about the agent's act unless the principal chose to ratify with awareness that such knowledge was

24  lacking." *Kristensen*, 879 F.3d at 1014 (quoting Restatement § 4.01 cmt b).  A principal is not

25  under an obligation "to conduct independent research" into how a purported agent conducts its

26  business.  *See Armstrong*, 2020 WL 2041935, at *12.  Instead, knowledge may be inferred only

27  if a principal "willfully ignores red flags" that an entity purporting to act on its behalf is violating

DAVIS WRIGHT TREMAINE LLP

920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

1  the TCPA.  *Id.* ("a wealth of cases suggests . . . that a defendant is not liable unless it willfully

2  ignores red flags"); *Abante Rooter*, 2019 WL 6907077, at *1 (rejecting a ratification theory of

3  vicarious liability based solely on the transmission of active leads to an inbound call center,

4  where company did not know about or remain "willfully ignorant" of TCPA violations).

5       *Kristensen* and *Henderson* demonstrate this principle as well.  In *Kristensen*, the

6  defendants did not have "actual knowledge that [the publisher] was sending text messages in

7  violation of TCPA," nor did they fail to investigate in the face of red flags.  879 F.3d at 1015.  At

8  most, the inclusion of a requirement in the lead generator's contract that the publisher comply

9  with the TCPA indicated "knowledge that an agent is engaged in otherwise commonplace

10  marketing activity," which "is not the sort of red flag that would lead a reasonable person to

11  investigate whether the agent was engaging in unlawful activities."  *Id.*  On the other hand, in

12  *Henderson*, the lenders knew through audits that its debt collectors were ***in fact*** violating the

13  TCPA, but "made no effort to end its relationship with any of these debt collectors or to ensure

14  future TCPA compliance."  918 F.3d at 1076.

15       Here, at the time of the call Renovation placed to Mr. Naiman, Blue Raven had every

16  reason to believe that its contractor, Renovation, abided by the terms of the parties' Master

17  Service Agreement and conducted its outbound marketing services in compliance with the

18  TCPA.  In the contract, Renovation represented explicitly that its lead-generation services for

19  Blue Raven would be follow all applicable laws and regulations, including the TCPA.  (SUF

20  No. 11 (citing Hernandez Decl., Ex. A (Master Service Agreement) at BRS_000004

21  (compliance)).)  Blue Raven also independently conducted due diligence into Renovation's legal

22  compliance to the extent possible based on the limited contractual relationship.  (SUF Nos. 42-

23  44.)  At the end of the day, however, Blue Raven necessarily and justifiably relied on

24  Renovation's representations given that it had no visibility or control over Renovation's calling

25  methods or operations.  (SUF Nos. 15-21.)

26       Blue Raven also did not ignore "red flags" regarding Renovation's calling activity.

27  *See Armstrong*, 2020 WL 2041935, at *12.  Prior to the allegedly unauthorized call to

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX (206) 757-7700

Mr. Naiman in April 2019, Blue Raven received TCPA complaints from only one individual during the fourteen months since it contracted with Renovation in February 2018.  (SUF No. 41.)  On or about July 23, 2018, Blue Raven and Renovation were named defendants in a lawsuit filed by Mark Fitzhenry in South Carolina Small Claims Court.  (Hernandez Decl. ¶ 11.)  Mr. Fitzhenry has filed dozens of lawsuits alleging violations of the TCPA and has made repeated claims against Blue Raven based on purported calls by Renovation and another Blue Raven lead-generation vendor.  (*Id.*)  Blue Raven investigated the allegations and received consistent representations from Renovation's CEO that Mr. Fitzhenry's unproven allegations were baseless.  (SUF Nos. 42-44.)  In particular, Blue Raven was informed by Renovation that Mr. Fitzhenry had opted-in to receive solicitations on different websites using different aliases in an active attempt to be called.  (Hernandez Decl. ¶ 12.)  Blue Raven was informed Mr. Fitzhenry that he had been filing suits in South Carolina small claims court for 15 years for purported TCPA violations.  (*Id.* ¶ 11.)  There was also no judicial finding in the initial Fitzhenry action, which was the only proceeding resolved prior to the April 2019 call to Mr. Naiman and which was resolved through a default judgment of $4,580.  (*Id*. ¶ 12.)[2]

Despite this lone source of customer complaints, Blue Raven took active steps to ensure that Renovation was abiding by its contractual promises, and there is no triable issue of fact regarding whether Blue Raven was "willfully ignorant" of Renovation's actions.  *See Kristensen*,

---

[2] In response, Mr. Naiman may identify complaints received *after* Renovation's call to Mr. Naiman in April 2019 was transferred to Blue Raven and *after* Mr. Naiman filed suit in September 2019.  Those later complaints eventually led to Blue Raven ending its relationship with Renovation (Harman Decl. ¶ 21), but none of those complaints affects the ratification analysis, which considers the purported knowledge of the principle at the time of the purported ratifiable act, i.e., the call to Mr. Naiman in April 2019.  Even in those cases, Blue Raven took consistent steps to identify and confirm the customer's allegations and Renovation's legal compliance with the TCPA.  (*Id.*)  In response to any complaints, Blue Raven's procedure has remained the same:  it would identify who made the call, reach out to a lead-generation vendor (if any) to discuss the complaint, and request information about the call and the authorization received to make the call.  (*Id*. ¶ 18; Hernandez Decl. ¶ 12.)  Blue Raven continued to receive consistent confirmation from Renovation that it acted in compliance with the Master Service Agreement.  (SUF No. 43.)

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

2015 WL 4477425, at *4 ("Ultimately, plaintiffs' theory of ratification is that defendants consciously remained ignorant of AC Referral's illicit texting practices.  But to be consciously ignorant a defendant must *fail to investigate* after becoming aware of specific reasons to be suspicious.") (emphasis added); *Armstrong*, 2020 WL 2041935, at *12 (granting motion for summary judgment because plaintiff's identification of one "pending lawsuit" against a third party lead-generation vendor was insufficient to establish ratification:  "Plaintiff has not established that IBD should have been aware of another litigation against Handstack, or that such a litigation constitutes a red flag").

Mr. Naiman thus cannot establish a triable issue of fact as to the element of ratification based on Blue Raven's response to any purported "red flag" regarding Renovation's conduct.

### c.   Blue Raven Did Not Benefit from Renovation's Action.

Blue Raven also did not receive any benefit from Renovation's call to Mr. Naiman at the time of the purportedly ratifiable action or afterwards, which further and independently forecloses any theory of vicarious liability based on ratification.

For ratification to occur, a person must "knowing[ly] accept[ ] a benefit" of the ratifiable action.  *See Henderson*, 918 F.3d at 1078 (quoting Restatement § 401 cmt. d).  Mr. Naiman cannot show that Blue Raven accepted any benefit whatsoever from the transfer of his call to Blue Raven.  Although he agreed to be transferred in April 2019, Mr. Naiman indisputably did not make any purchase then or otherwise transact business with Blue Raven at the time of the call or at any time since.  (SUF No. 36.)

Courts routinely reject ratification claims where, as here, the defendant accepted no benefit from the purportedly illicit call placed to the plaintiff by a third party.  *See Bilek v. Fed. Ins. Co.*, 2020 WL 3960445, at *5 (N.D. Ill. July 13, 2020), *appeal docketed*, No. 20-2504 (7th Cir. Aug. 12, 2020) ("While Bilek argues that HII accepted benefits from *other* calls, he does not allege that HII received any benefit from the calls made to *him*.  For example, he does not allege that he purchased any insurance through either of the phone calls he received.  Therefore, Bilek's ratification argument fails.") (emphases added); *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727,

745-46 (N.D. Ill. 2014) ("Plaintiff's ratification theory fails because plaintiff does not allege that Sempris or Provell accepted any benefit that stemmed from Quality's telemarketing calls to plaintiff.  Indeed, plaintiff fails to allege that she did business with Sempris or Provell as a result of Quality's calls."); *see also Jones v. All Am. Auto Prot., Inc.*, 2015 WL 7566685, at *5 (D. Nev. Nov. 24, 2015), *aff'd sub nom.* 887 F.3d 443 (9th Cir. 2018) (no ratification where "Plaintiffs did not provide any specific allegations that [defendant] received any benefit" because "none of the Plaintiffs allege that they spoke to or did business with [defendant] as a result of [the caller's] calls").

For instance, in *Bilek*, a district court rejected a ratification theory where the plaintiff "does not allege that he purchased any insurance through either of the phone calls he received," regardless of whether the defendant "accepted benefits from other calls."  2020 WL 3960445, at *5.  Likewise, in *Toney*, the court held that "Plaintiff's ratification theory fails because plaintiff does not allege that [defendants] accepted any benefit that stemmed from [the caller's] telemarketing calls to plaintiff" because "plaintiff fails to allege that she did business with [defendants] as a result of [the caller's] calls," despite allegations that the defendants "ratified [the caller's] misconduct by knowingly accepting the benefits from tens of thousands of sales" to other customers called unlawfully.  75 F. Supp. 3d at 745-46.[3]

As in these cases, the undisputed fact is that Mr. Naiman has no evidence—or even allegations—that Blue Raven received any benefit from Renovation's call to him.  To the contrary, the undisputed facts are that Mr. Naiman voluntarily set an appointment with Blue

---

[3] Some courts have allowed putative class representatives to rely on benefits conferred by *other* putative class members to establish this element of ratification.  *See, e.g.*, *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, 2018 WL 3707283, at *5 (N.D. Cal. Aug. 3, 2018).  Doing so, however, improperly allows the class action allegations to relieve a plaintiff of his burden to prove his individual claim.  *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (Rule 23 "must be interpreted in keeping with … the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right,' 28 U.S.C. § 2072(b)"); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (same).

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

Raven but proceeded to cancel it and never made any purchase from Blue Raven.  (SUF Nos. 33-34.)  His ratification theory fails as a result.

## V.      CONCLUSION

The Court should grant summary judgment in Blue Raven's favor on Mr. Naiman's TCPA claim because Blue Raven did not call Mr. Naiman and Renovation had no actual, apparent, or ratification-based authority to call Mr. Naiman on Blue Raven's behalf.

Dated:  September 18, 2020

 /s/ Kenneth E. Payson
Kenneth E. Payson (admitted *pro hac vice*)
Davis Wright Tremaine LLP
920 Fifth Ave., Suite 3300
Seattle, WA 98104
(206) 757-8126
*kennethpayson@dwt.com*

James H. Moon (admitted *pro hac vice*)
Davis Wright Tremaine LLP
865 S. Figueroa St., Suite 2400
Los Angeles, CA 90017
(213) 633-6819
*jamesmoon@dwt.com*

Jeff Silvestri (Nevada Bar No. 5779)
McDonald Carano LLP
2300 W. Sahara Avenue, Suite 1200
Las Vegas, NV 89102
(702) 873-4100
*jsilvestri@mcdonaldcarano.com*

*Attorneys for Defendant Blue Raven Solar, LLC*

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that on September 18, 2020, I caused the foregoing to be electronically

3

filed with the Clerk of the Court using the CM/ECF system which will send notifications of such

4

filing to all counsel of record as of the time of the filing.

5

6

/s/ Kenneth E. Payson
Kenneth E. Payson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
(206) 622-3150 FAX: (206) 757-7700